INDEPENDENT MILK PRODUCERS CO-OP,
Plaintiff-Appellant,

v.

Marvin STOFFEL, Ronald Stoffel, J. Erwin Coffey, Carroll L. Ehlers, David Schaeffer, Certified Grocers, Inc., a foreign corporation, Country Delight, a division of Certified Grocers, Inc., and Larry Ehlers, Defendants-Respondents.

Court of Appeals

*No. 79–1256. Submitted on briefs August 4, 1980.
—Decided September 9, 1980.*
(Also reported in 298 N.W.2d 128.)

2

For the plaintiff-appellant there was a brief by *Franks & Pikofsky, S.C.* of Milwaukee.

For the defendants-respondents there were briefs by *Storck Law Office* of Mayville; *O'Meara, Eckert & Pouros* of West Bend; *John K. Kallman* of *Rudnick & Wolfe* of Chicago, Illinois; and *William J. Hickmann* of *Schloemer, Schlaefer, Alderson, Hickmann, Seefeldt & Spella, S.C.* of West Bend.

Before Voss, P.J., Brown and Scott, J.J.

BROWN, J.   Independent Milk Producers Co-op sued several defendants, alleging conspiracy in restraint of trade contrary to sec. 133.01, Stats.  In particular, Independent alleged defendants conspired to persuade its customers to move their business to a competing milk facility.  The jury returned a verdict in favor of the defendants, finding no conspiracy.  Because there is sufficient evidence in the record to support the verdict, and we agree with the trial court's interpretation of the applicable law, we affirm.

On appeal, Independent alleges trial court error in submitting the case to the jury on a "rule of reason" theory rather than a *per se* theory as requested by Independent. It consistently argued that defendants' alleged conduct constituted a *per se* violation of sec. 133.01, Stats.  Accordingly, it objected during discovery and through a motion *in limine* to exclude all evidence concerning its financial condition, arguing that such evidence was not relevant.  It also objected to evidence of allegations of

embezzlement by Independent's manager. The trial court denied both objections ruling that the rule of reason controlled, making the evidence relevant and admissible.

Independent Milk Producers is a dairy co-operative organized pursuant to ch. 185 of the Wisconsin Statutes. It received milk from sixty-two member/producers in Dodge, Washington, Fond du Lac and Jefferson counties. About two billion pounds of milk are produced annually in these four counties. In 1976, Independent handled approximately thirty-nine million pounds of milk. Independent and defendant Certified Grocers were two of sixteen milk companies buying fresh milk from area farmers.

Defendant Carroll Ehlers is a dairy farmer and was the Co-op's president throughout the alleged conspiracy. Defendant Larry Ehlers, Carroll's son, operated a milk hauling route, transporting milk from member farms to the Co-op's intake facility. Defendant Certified Grocers is one of Independent's competitors, receiving milk from Wisconsin farmers at its intake plant in Chicago. Defendant David Schaeffer was a milk hauler for Certified.

Independent had severe financial and management problems in 1976 and 1977. The general manager of the Co-op, Miriam Rettig, was charged with embezzlement from a cheese company which bought milk from Independent. Several articles about the embezzlement charges appeared in local newspapers. From January of 1977 through July of 1977, there were several large overdrafts on Independent's milk trust account required by the state to insure milk payments are made to the producers. In May of 1977, a notice of tax sale of the Slinger intake facility appeared in a farm paper. Electricity was temporarily disconnected because of overdue bills, and the July 1977 fiscal statement showed a trust overdraft of $43,741.27 and an annual loss of $35,599.

In September 1977, fifteen of Independent's members left and began shipping their milk to other facilities. Of those, eleven went to Certified. Mrs. Rettig testified that prior to this loss, Independent received 110,000 pounds of milk a day and after they left, 70,000 pounds. This represents about thirty-seven percent loss in business. Eleven more farmers left the Co-op in December 1977 with four switching to Certified. These defections led Independent to charge defendants with conspiracy to induce the producers to transfer their business, destroy Independent and limit competition in the milk business.

However, there was overwhelming evidence at trial that the defecting farmers left Independent because of its precarious financial condition and the embezzlement charges against Mrs. Rettig. No producer testified that any statement or conduct by any of the defendants influenced his decision to quit Independent.

Two issues must be addressed in this appeal. First, whether the alleged actions of the defendants constituted a *per se* violation of antitrust law. If so, evidence of Independent's management difficulties was irrelevant and should have properly been excluded. Second, whether there is sufficient evidence to support the jury's finding of no conspiracy.

## *PER SE*/RULE OF REASON

Chapter 133 of the Wisconsin Statutes is drawn largely from federal antitrust law. Interpretation of sec. 133.01(1), Stats., prohibiting conspiracies in restraint of trade or commerce, is controlled by federal case law. *Grams v. Boss*, 97 Wis.2d 332, 346, 294 N.W.2d 473, 480 (1980); *State v. Waste Management of Wisconsin, Inc.*, 81 Wis.2d 555, 569, 261 N.W.2d 147, 153 n. 12 (1978), *cert. denied*, 439 U.S. 865 (1978). The federal

antitrust law, the Sherman Act,[1] applies to interstate commerce, while the state law applies to intrastate commerce. *Id.* at 574, 261 N.W.2d at 155; *John Mohr & Sons, Inc. v. Jahnke*, 55 Wis.2d 402, 410, 198 N.W.2d 363, 367 (1972). Wisconsin case law being scarce on this issue, state courts look to the federal courts for guidance.

The literal language of both Section 1 of the Sherman Act and sec. 133.01(1), Stats., declares every conspiracy in restraint of trade or commerce to be illegal. However, the United States Supreme Court in *Standard Oil of New Jersey v. United States*, 221 U.S. 1 (1911), ruled that only unreasonable restraints on trade were intended to fall within the scope of the act. The fact finder should weigh all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. *Id.* at 63–69.

The classic articulation of this "rule of reason" is found in *Chicago Board of Trade v. United States*, 246 U.S. 231, 238 (1918):

The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint, and its effect, actual or probable. The history of the restraint, the evil believed to exist,

---

[1] 15 U.S.C. §1 (1970) states as follows:

SEC. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal: . . . .

the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

It is evident that under a "rule of reason" approach, courts are free to consider any factor relevant to the inquiry. An analysis of the reasonableness of a restraint includes an examination of the purpose of the restraint, market power, and the anticompetitive effect of the restraint. *Grams v. Boss, supra,* at 348, 294 N.W.2d at 481. A restraint to be found unreasonable must have a significant impact on competition in the marketplace. The relevant market, both product and geographic, must be identified, and the impact of the restraint of the relevant market is then determined. *Brown Shoe Co. v. United States,* 370 U.S. 294 (1962). If the impact is not significant, the alleged conduct is allowed.

A second line of analysis has also developed under Section 1 of the Sherman Act. The *per se* doctrine holds there are certain practices which are so blatantly anticompetitive that they are illegal regardless of their market impact or possible justifications. An anticompetitive effect is presumed. The controlling rule is:

[C]ertain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5 (1958); *Grams v. Boss, supra,* at 349, 294 N.W.2d at 482.

Conduct labelled as *per se* illegal includes price fixing, *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150 (1940); group boycotts, *Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207 (1959); horizontal market allocation, *United States v. Topco Associates, Inc.,* 405

U.S. 596 (1972); resale price maintenance, *Albrecht v. The Herald Co.*, 390 U.S. 145 (1968), and tying arrangements, *Northern Pacific Railway Co. v. United States, supra.* While the *per se* rule makes proscribed conduct more identifiable and avoids complex economic analysis, it may lead to harsh results since no mitigating factors may be considered by the courts.

This disadvantage was recognized by the Supreme Court in *Continental Television, Inc. v. GTE-Sylvania, Inc.*, 433 U.S. 36 (1977). There, the Supreme Court held that vertical market allocations were not *per se* illegal but rather should be subjected to a rule of reason analysis. By doing so, the Court reversed *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365 (1967), which had declared such allocations *per se* illegal.

The Court in *GTE-Sylvania* was clearly reluctant to extend the scope of the *per se* rule recognizing that the advantages of a *per se* analysis "are not sufficient in themselves to justify the creation of per se rules. If it were otherwise, all of antitrust law would be reduced to *per se* rules, thus introducing an unintended and undesirable rigidity in the law." *Continental Television, Inc. v. GTE-Sylvania, Inc., supra,* at 50 n. 16.

The basic issue in this case is whether defendants' conduct warranted a *per se* or rule of reason analysis. Independent maintains the defendants' conduct should have been treated as *per se* violations. Defendants' conduct does not fall within any of the traditional *per se* categories. Therefore, we must decide whether a conspiracy to eliminate competition is illegal *per se*. The issue becomes whether such conduct has a "pernicious effect on competition" and is devoid "of any redeeming virtue." *Northern Pacific Railway Co. v. United States, supra.*

The Wisconsin Supreme Court recently faced this issue in *Grams v. Boss, supra.* However, because the case was before the court at the pleading stage, it declined to decide the issue.[2]

The procedural considerations which persuaded the court in *Grams* to not decide the issue are not present in this case. This dispute has been fully litigated before a jury. Upon a complete review of both the record and legal precedent, we hold the conduct alleged by Independent must be analyzed under a rule of reason standard.

The alleged conspiracy can best be described as an attempt to divert customers from one business to a competitor. It is not illegal for a company to try to attract business, especially at the expense of a competitor. Such practices are everyday occurrences in the business world. Concededly, if defendants had used *per se* illegal means such as resale price maintenance, we might be compelled to hold otherwise. But, such was not the case here.

Independent relies on *Albert Pick-Barth v. Mitchell Woodbury Corp.*, 57 F2d 96 (1st Cir 1932), *cert. denied,* 286 U.S. 552 (1932), where the court stated, "Intent . . . to eliminate a competitor . . . and thereby suppress competition . . . is a violation of section 1." *Id.* at 102. However, only the tenth circuit has followed

[2] In *Grams,* an insurance agency alleged that defendants "agreed, combined and conspired to cause the termination" of plaintiffs' licenses to sell Blue Cross health insurance. *Grams v. Boss, supra,* at 335–36, 294 N.W.2d at 475–76.

Plaintiffs alleged defendants' "conduct was intended and designed . . . to force plaintiffs out of the insurance business." *Id.* at 336, 294 N.W.2d at 476. Defendants' motion for summary judgment was granted by the circuit court. The Court of Appeals reversed, finding sufficient allegations to support a claim under sec. 133.01, Stats., and that affidavits showed a factual dispute making summary judgment unavailable.

*Pick-Barth,* and the first circuit itself has questioned its viability. *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547, 561 (1st Cir. 1974).

The Court in *Grams, supra,* noted that *Whitten* "applied the rule of reason test to the facts of the case and required the plaintiff to prove that defendant's conduct amounted to an unreasonable restraint of trade, that is, had an anti-competitive effect on the market." *Grams v. Boss, supra,* at 350, 294 N.W.2d at 482. The Court further acknowledged the recent trend in federal cases is to apply the rule of reason rather than the *Pick-Barth per se* rule. *Id.*

Such language indicates that when faced with this issue, the Wisconsin Supreme Court will adopt a rule of reason approach to conspiracy to eliminate competition cases. We hold that the trial court properly rejected Independent's argument that the alleged conduct was *per se* illegal and adopted the rule of reason as the controlling law.

The issue then becomes whether the restraint of trade resulting from the alleged conduct is reasonable. Under the rule of reason, the fact finder may examine the motivation and effect of the alleged restraint. *Chicago Board of Trade v. United States, supra.* Under that standard, evidence of the financial condition of the co-operative becomes highly relevant and therefore admissible. If a dairy co-operative cannot meet its financial obligations, its members/producers receive no remuneration for their milk. Certainly, displeasure with Independent's management could justifiably cause a farmer to change to a competitor. We find no error in the trial court's submission of this case to the jury under a rule of reason analysis.

Independent also objected to testimony concerning the embezzlement and related newspaper articles. It argued that such evidence had no probative value and was highly prejudicial. Independent's objection is premised on sec. 904.03, Stats., which provides that evidence, even if relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. The exclusion of such evidence is within the trial court's discretion after balancing the probative value and possible prejudice. *State v. Wollman,* 86 Wis.2d 459, 464, 273 N.W.2d 225, 228 (1979). The test on appeal is whether appropriate discretion was in fact exercised by the trial court. *Id.* It is not necessary that the appellate court agree with the trial court's ruling.

We are satisfied the trial court did exercise the appropriate discretion. Having determined that the rule of reason was controlling in this instance, it is clear that this evidence was highly probative. A court may look to the underlying reasons for the allegedly illegal conduct. If the *per se* rule is applied, any justifications are irrelevant. Several farmers testified that they had heard of the embezzlement allegations and seen the newspaper articles. They became concerned about Mrs. Rettig's ability to competently manage the Co-op's business affairs. Several farmers testified that these facts influenced their decision to leave Independent. Thus, this evidence contradicts Independent's allegation of a conspiracy among defendants. It reveals an extraneous factor led to the defection to Certified and not any conduct of defendants. The trial court properly admitted the evidence.

Independent next argues the trial court erred in not giving the following instruction to the jury:

In your consideration of the evidence in the case as to the conspiracy charged, you should first determine whether or not the conspiracy existed, as alleged in the complaint. If you conclude that the conspiracy did exist, you should next determine whether or not the defendants, or any of them, were knowingly members of the conspiracy.

If it appears from a preponderance of the evidence in the case that the conspiracy alleged in the plaintiff's complaint was knowingly formed, and that the defendants, or one or more of them, knowingly became members of the conspiracy, either at the inception or beginning of the plan or scheme, or afterwards, then the success or failure of the conspiracy to accomplish the common object or purpose is immaterial, so long as the plaintiff sustained some damage as a result of the conspiracy.

Independent claims that failure to give this instruction left the jury with the impression that in order to find a violation of sec. 133.01(1), Stats., the conspiracy must be in fact successful.

However, the instruction itself states that the jury must "first determine whether or not the conspiracy existed." Question seven of the special verdict addressed that issue:

### QUESTION SEVEN

Was there a conspiracy among two or more of the defendants, Carrol [sic] L. Ehlers, David Schaeffer, Certified Grocers Inc. (Country Delight) and Larry Ehlers to destroy Plaintiff, Independent Milk Producers Co-op, as a competitor and to limit competition for the milk of the various producers of this State?

The jury decided no conspiracy among the defendants existed. Therefore, failure to instruct that an unsuc-

cessful conspiracy would constitute a violation of sec. 133.01(1), Stats., cannot have prejudiced Independent. A new trial is not warranted if no prejudice results from the alleged error. *Holtz v. Fogarty,* 270 Wis. 647, 650, 72 N.W.2d 411, 413 (1955).

We are further satisfied there is sufficient credible evidence to sustain the jury's verdict. No farmer testified that any statements or acts by the defendants influenced his decision to leave Independent. Several other plausible explanations for the defections appear in the record. The jury's finding will be sustained.

Upon the entire record, we find no reversible error by the trial court, and there was sufficient credible evidence to support the jury verdict.

*By the Court.*—Judgment affirmed.